UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>vs.<br><br>DARON LEE JUNGERS,<br>a/k/a "sexymd2spoilu@yahoo.com,"<br>a/k/a "Josh Broden,"<br><br>                              Defendant. | CR. 11-40018<br><br><br>**DEFENDANT'S BRIEF<br>IN SUPPORT OF MOTION FOR<br>JUDGMENT OF ACQUITTAL** |

Defendant Daron Lee Jungers respectfully submits this brief in support of his motion for judgment of acquittal made pursuant to Federal Rule of Criminal Procedure 29(a).

## BACKGROUND

The defendant has been indicted for "Attempted Commercial Sex Trafficking" in violation of 18 U.S.C. §§ 1591 and 1594(a). The indictment alleges that he "knowingly, in and affecting interstate commerce, attempted to *recruit*, *entice* and *obtain* a person who had not attained the age of 18 years, and knew that the person would be caused to engage in a commercial sex act; all in violation of 18 U.S.C. §§ 1591 and 1594(a)." (emphasis supplied).

In February 2011, the Department of Homeland Security, acting through U.S. Immigration and Customs Enforcement, initiated an undercover operation in Sioux Falls in which it placed an advertisement offering sex with minors. The government alleges that the defendant responded affirmatively to the advertisement, traveled to a predetermined location, and met with an undercover agent in order to finalize the transaction, whereupon he was arrested. Because this was a sting operation, there was no actual minor with whom

the defendant could have engaged in a commercial sex act. As a result, he has been charged under section 1594(a) with attempting to commit the cited offense.

In his motion for judgment of acquittal, the defendant respectfully contends that accepting the government's evidence as true, the alleged facts cannot and do not constitute an attempt to engage in commercial sex trafficking in violation of 18 U.S.C. § 1591. The defendant therefore respectfully requests that his motion for judgment of acquittal be granted.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *See also United States v. Boesen*, 491 F.3d 852, 855 (8th Cir. 2007). "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Cacioppo*, 460 F.3d 1012, 1021 (8th Cir. 2006) (addition citations omitted).

## ARGUMENT

**I.   Judgment of acquittal should be granted because the government failed to prove that the defendant engaged in child sex trafficking under a proper construction of section 1591.**

The defendant has been indicted for attempting to engage in commercial sex trafficking in violation of 18 U.S.C. § 1591 ("Sex trafficking of children or by force fraud or coercion"). Section 1591 was enacted as part of the Trafficking Victims Protection Act of 2000 (TVPA), 114 Stat. 1464 (October 28, 2000). *See United States v. Marcus*, 130 S.Ct. 2159,

2163 (2010). "The TPVA criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking *for commercial gain.*" *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007) (emphasis supplied). In enacting the TVPA, Congress recognized that human trafficking, particularly of women and children in the sex industry, "is a modern form of slavery, and it is the largest manifestation of slavery today." 22 U.S.C. § 7101(b)(1); *see also id.* at §§ 7101(b)(2), (4), (9), (11). With regard to sex trafficking of children, the relevant text of the act punishes anyone who:

> knowingly . . . in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person . . . knowing . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act [.]

18 U.S.C. § 1591. As the Eighth Circuit has explained, in order to obtain a conviction under this statute, the government is required to prove that the defendant "knowingly recruited, enticed, harbored, transported, provided, or obtained a minor, knowing the minor would be caused to engage in commercial sex acts." *United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009); *see also United States v. Daniels*, --- F.3d ---, 2011 WL 2637274 *8 (6th Cir. July 7, 2011).

In the indictment, the government has charged that the defendant attempted to violate section 1591 in three separate ways: Jungers attempted to (1) recruit; (2) entice; and (3) obtain a minor, knowing that she "would be caused to engage in commercial sex acts." As discussed below, however, the government's evidence presented at trial does not establish that the defendant attempted to do any of those three specific things under a proper construction of those terms as considered in their statutory context. Whatever else he may have done, the defendant did not attempt to engage in the specific and particularized

3

activity prohibited by section 1591: "Sex trafficking of children."  As a result, the motion for judgment of acquittal should be granted.

**A.     The text and structure of section 1591 does not support its application to these alleged acts.**

The resolution of this motion turns upon the interpretation of the terms "recruit," "entice," and "obtain" as intended by Congress in enacting section 1591. "[T]he starting point in interpreting a statute is always the language of the statute itself."  *United States v. Whiting*, 165 F.3d 631, 633 (8th Cir. 1999).  "If the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end."  *Id.*  Although the statute defines several of its important terms, section 1591 provides no definition of "recruit," "entice," or "obtain."  When statutory terms are left undefined, courts are to give them their "ordinary meaning."  *United States v. Santos*, 553 U.S. 507, 510 (2008) (quoting *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)); *see also Smith v. United States*, 508 U.S. 223, 228 (1993).

*1.     "Recruits" or "Entices"*

The government's charge that the defendant attempted to "recruit" or "entice" a minor, knowing that she "would be caused to engage in a commercial sex act," can be readily dispelled with reference to the ordinary meaning of those terms.  Dictionaries generally define the verb "recruit" as "to register formally as a participant or member" or "to seek to employ."  Webster's Third New International Dictionary (1981).  In the present case, the evidence does not indicate that the defendant attempted to target a minor for the purpose of bringing her into any illegal venture, seek to employ, or otherwise commandeer the services of a minor for commercial gain.  Rather, under the scenario created by the sting operation,

the undercover agent had already recruited the minor involved and initiated her involvement in his scheme.  Regarding the defendant, the allegations are that he attempted to pay the agent who had supposedly "recruited" the minor to engage in a commercial sex act with those from whom he solicited payment.  Under the government's evidence, the defendant did not "recruit" anyone within the meaning of section 1591.

Webster further defines the verb "entice" as to "provoke someone to do something through (often false or exaggerated) promises or persuasion" or "to draw on, by exciting hope or desire; to allure; to attract."  Webster's Third New International Dictionary (1981). The evidence does not establish that the defendant attempted to entice, persuade, or allure a minor into engaging into a commercial sex act with him.  The government's evidence establishes only that he attempted to pay a third person in order to engage in prohibited sex acts.  No attempt to recruit or entice, no promises or persuasion, to any minor on the defendant's behalf were involved.  The alleged conduct in question was an attempt to provide payment to a trafficker in exchange for a *fait accompli*.  The ambit of the statutory terms "recruit" and "entice" are addressed to individuals who attempt to target minors, lure or draw them in, and bring them under their domination or control in order to force them into prostitution or otherwise offer them up to others for commercial sex acts.

The government's evidence is insufficient to sustain a conviction under section 1591 under a proper construction of the ordinary meaning of the statutory terms "recruit" and "entice."  "There is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt" of attempting to recruit or entice a

minor knowing that she would be caused to engage in a commercial sex act. *Cacioppo*, 460 F.3d at 1021.

      2.    *"Obtains"*

The government's charge that the defendant attempted to "obtain" a minor knowing that she would be caused to engage in a commercial sex act also must fail. The ordinary definition of "obtain" is "to gain or attain possession or disposal" or "hold, keep, possess, occupy." Webster's Third New International Dictionary (1981). Interpreting the term within the context of another statute, the Ninth Circuit has stated:

> Consulting dictionaries, as we may "to determine the plain meaning of a term," *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009), we find that "obtain" means: "to gain or attain [usually] by planned action or effort." Webster's New Collegiate Dictionary 816 (9th ed. 1991); *see also* Black's Law Dictionary 1078 (6th ed. 1990) ("To get hold of by effort; to get possession of; to procure; to acquire, in any way."). According to these definitions, "obtains" includes attaining or acquiring a thing of value in any way, without limiting who ultimately receives it.

*United States v. Ramos-Arenas*, 596 F.3d 783, 787 (9th Cir. 2010). Thus, the ordinary meaning of the verb "obtains" suggests some form of attainment, possession, or acquisition.

This is, arguably, a fairly broad term. It may well mean different things in different situations. But because "[e]ven a broad phrase has limits," courts are instructed not to read individual words in isolation, for that "'would ignore the rule that, because statutes are not read as a collection of isolated phrases, [a] word in a statute may or may not extend to the outer limits of its definitional possibilities.'" *United States v. Brown*, 598 F.3d 1013, 1016 (8th Cir. 2010) (quoting *Abuelhawa v. United States*, 129 S.Ct. 2102, 2105 (2009)). The term "obtains" accordingly must be considered "in context." *Brown*, 598 F.3d at 1016.

"Section 1591 does not criminalize all acts of prostitution (a vice traditionally governed by state regulation).  Its reach is limited to *sex trafficking* that involves children or is accomplished by force, fraud, or coercion."  *Evans*, 476 F.3d at 1179 n. 1 (emphasis supplied).  The statute is aimed at child sex *traffickers* – the operators or purveyors of such ventures and activities – rather than its customers, or, obviously, its victims.  This is the obvious intended purpose of section 1591 in criminalizing the actions of those who "obtain" minors knowing that they "will be caused to engage in a commercial sex act" – punishing those who acquire control over minors in order to facilitate or profit from their exploitation in the sex trade.

The government argues another interpretation.  By virtue of its prosecution of the defendant under this particular statute, the government contends that it is the *customers* or "johns" themselves that actually "obtain" minors within the meaning of section 1591 when they engage in commercial sex acts with them.  Under this interpretation, it is not child sex traffickers, such as brothel owners or "pimps" who gain or acquire control over minors recruited, enticed, or otherwise forced into submission by other parties that are guilty of "obtaining" minors with the knowledge that they "will be caused" to engage in commercial sex acts.  Instead, the theory goes, those who "obtain" minors within the meaning of the statute are those individuals from whom child sex traffickers extract their illegal profits: the clients of prostitution or other illegal commercial sex practices.

Both of these contrasting interpretations of the meaning of "obtains" as intended by Congress in enacting section 1591 cannot be correct.  As the Supreme Court held in *Clark v. Martinez*, 543 U.S. 371, 378 (2005), the meaning of words in a statute cannot change with the

statute's application.  To hold otherwise, the Supreme Court explained, "would render every statute a chameleon," and "would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases." *Id.* at 382, 386.  The Supreme Court will not engage in the "interpretative contortion" of "giving the same word, in the same statutory provision, different meanings in different factual contexts." *Santos*, 553 U.S. 507 at 522-23.  This cannon of construction clearly points to adoption of the defendant's proposed interpretation of what it means to "obtain" a minor knowing that she "will be caused to engage in a commercial sex act" within the meaning of section 1591.

If Congress intended "obtains" to refer to the conduct of those who have initially recruited, enticed, or forced minors or others into servitude – all of whom are a part of a sex trafficking venture – then it cannot be interpreted differently in another factual context to refer to the conduct of those who actually engage in the commercial sex acts made possible by the traffickers.  *See Clark*, 543 U.S. at 382, 386; *Santos*, 553 U.S. at 522-23.  Were it otherwise, the term "obtains" as employed in section 1591 would have a dual meaning.  The government may wish to read the term "obtains" so that it can mean different things in different factual scenarios that it believes should be implicated by section 1591, but a statutory duality or  ambiguity is not a permissible construction of Congress's intent where a criminal statute is concerned.

Another canon of construction, *ejusdem generis*, similarly supports the defendant's interpretation of section 1591 as intended to apply to those engaged in sex trafficking enterprises or ventures.  "The doctrine of *ejusdem generis* provides that 'when there are general

words following particular and specific words, the former must be confined to things of the same kind.'" *United States v. Auginash*, 266 F.3d 781, 784 (8th Cir. 2001) (citations omitted); *see also James v. United States*, 550 U.S. 192, 199 (2007) (explaining *ejusdem generis* as the canon "that when a general phrase follows a list of specifics, it should be read to include only things of the same type as specifically enumerated").

Section 1591 contains just such a list of prohibited activities, punishing anyone who "recruits, entices, harbors, transports, provides, obtains, or maintains" anyone under the age of eighteen knowing that they "will be caused to engage in a commercial sex act." The common attribute of these action verbs recited in section 1591 is that each represents a potential stage in the process of engaging in a child sex trafficking venture. Listed in chronological order, they all describe methods of gaining control over victims in preparation for the planned eventuality that they "will be caused" to engage in commercial sex acts. The list of activities prohibited by the statute does not include the activity, reprehensible as it is, of paying for sex itself.

This is a critical and dispositive distinction. And it is the only one supported by material terms that Congress *has* defined. In enacting the TVPA, Congress defined the activity of "sex trafficking" as something separate from the activity of engaging in a "commercial sex act." The United States Code accordingly defines "Sex trafficking" as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act." 22 U.S.C. § 7102(9). This is the precise language that Congress employed in criminalizing the conduct prohibited by section 1591. A "commercial sex act," in contrast, is defined as "any sex act on account of which anything of value is given to or

9

received by any person."  22 U.S.C. § 7102(3).  Section 1591 itself defines "commercial sex act" in the identical fashion.  18 U.S.C. 1591(e)(3).

Thus, the act of engaging in a prohibited commercial sex act, while certainly illegal under other statutes, is not, standing alone, to be "sex trafficking."  The statute makes clear that "sex trafficking" – the organized activity of recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining minors knowing that they "will be caused" to engage in commercial sex acts – is the *predicate* to the commercial sex act itself.  Put another way, the government's interpretation of this statute specifically addressing the industry or activity of child sex trafficking as intending to reach the customers of such enterprises is the equivalent of suggesting that a "bootlegging" statute was intended to criminalize the customers of speakeasies.  This is not to say that the customers of both such prohibited enterprises would not be guilty of different crimes, but merely to underscore that this particular statute, as written, was intended to address the organized activity representing the "supply" side of the criminal equation.

Additional considerations lead to the conclusion that the alleged conduct here does not constitute an attempt to "obtain" within the meaning of section 1591.  Section 1591's placement within a broader statutory scheme makes clear that it was aimed at those engaging in the business of human trafficking.  The statute's title section is "Peonage, Slavery, and Trafficking in Persons," and its subchapter title is "Sex trafficking of children or by force, fraud, or coercion." Although a statute's title section and subchapter titles cannot alter the plain meaning of a statute, they can "assist in clarifying ambiguity."  *United States v. May*, 535 F.3d 912, 916 (8th Cir. 2008) (citations omitted); *see also I.N.S. v. National Center for Immigrants'*

*Rights, Inc.*, 502 U.S. 183, 189 (1991) (explaining that "the title of a statute or section can aid in resolving an ambiguity in the legislation's text"). Section 1591 was passed in conjunction with 18 U.S.C. § 1589, which prohibits those who conscript others into forced labor. Section 1590 prohibits the trafficking of a person into servitude. And section 1592 prohibits withholding identification documents in connection with a trafficking offence. All of these interlocking statutes are directed at individuals running operations or engaging in commercial activities for the purpose of exploiting others. None are directed at the "customers" of such enterprises.

### B.    Section 1591's legislative history does not support its application to these alleged acts.

After addressing the text and structure of a statute and employing applicable canons of construction, courts sometimes look to its legislative history in seeking to resolve any remaining ambiguity. As one appellate court explained, "[i]t is a cardinal canon of statutory construction that statutes should be interpreted harmoniously with their dominant legislative purpose." *United States v. Nader*, 542 F.3d 713, 720 (9th Cir. 2008).

Congress first enacted 18 U.S.C. § 1591 as part of the Trafficking Victims Protection Act of 2000 (TVPA), Pub. L. 106-386, 114 Stat. 1464 (October 28, 2000). *See United States v. Marcus*, 130 S.Ct. 2159, 2163 (2010). The TVPA criminalized human trafficking in two sections: "Trafficking with respect to peonage, slavery, involuntary servitude or forced labor," 18 U.S.C. § 1590(a), and "Sex trafficking with children or by force, fraud, or coercion." 18 U.S.C. § 1591(a). These twin trafficking definitions of the TVPA largely mirror each other in structure. According to Congress, the overriding purpose of the act was "to combat trafficking in persons, a contemporary manifestation of slavery whose

victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  114 Stat. 1464, § 102(a); H.R. CONF. REP. 106-939, 2000 WL 1479163 at *3.

As is indicated in the Congressional findings, 114 Stat. 1464, § 102(b)(1)-(24), Congress focused upon criminalizing the conduct of those engaged in the business of sex trafficking.  There is no indication that the TPVA was intended to apply beyond the scope of those actually engaged in the business or activity of trafficking itself.[1]  The remarks of Senator Wellstone (who along with Senator Brownback was primarily responsible for passage of the TPVA) appearing in the Congressional Record are indicative of Congress's specific intent in passing this particularized legislation to direct its punishments to the profiteers, not the patrons:

> The trafficking of human beings for forced prostitution and sweatshop labor is a rapidly growing human rights abuse. It is one of the greatest aspects of the globalization of the world economy. The Victims of Trafficking and Violence Protection Act of 2000 is the first piece of legislation to address the widespread practice of the trafficking of men, women, and children into sweatshop labor and sexual bondage.
>
> . . . Our Government estimates that 2 million people are trafficked each year. Of those, 700,000 women and children, primarily young girls, are trafficked from poor countries to rich countries and sold into slavery, raped, locked up, physically and psychologically abused, with food and health care withheld. Of those, as many as 50,000 immigrants are brought into the United States each year, and they wind up trapped in brothels, sweatshops, and other types of forced labor, abused and too fearful to seek help.
>
> Traffickers exploit the unequal status of women and girls, including harmful

---

[1] *See, e.g.,* H.R. REP. 106-942, H.R. Rep. No. 942, 106TH Cong., 2ND Sess. 2000, 2000 WL 1479677; H.R. CONF. REP. 106-939, 2000 WL 1479163; H.R. REP. 106-487(I), 1999 WL 1062882; H.R. REP. 106-487(II), 2000 WL 381434.  146 Cong. Rec. H11943-07, 2000 WL 1777678 ; 146 Cong. Rec. D1168-02, 2000 WL 1649105 ; 146 Cong. Rec. H11193-01, 2000 WL 33687881; 146 Cong. Rec. S10889-02, 2000 WL 1575428.

stereotypes of women as property and sexual objects to be bought and sold. Traffickers have also taken advantage of the demand in our country and others for cheap, unprotected labor. <u>For the traffickers, the sale of human beings is a highly profitable, low-risk enterprise as these women are viewed as expendable and reusable commodities</u>.

Overall, profit in the trade can be staggering. It is estimated that the size of this business is $7 billion annually, only surpassed by that of the illegal arms trade. Trafficking has become a major source of new income for criminal rings. It is coldly observed that drugs are sold once while a woman or a child can be sold 10 or 20 times a day.

. . . Seeking financial security, many innocent persons are lured by traffickers' false promises of a better life and lucrative jobs abroad. Seeking this better life, they are lured by local advertisements for good jobs in foreign countries at wages they could never imagine at home. However, when they arrive, these victims are often stripped of their passports, held against their will, some in slave-like conditions, in the year 2000.

Rape, intimidation, and violence are commonly employed by traffickers to control their victims and to prevent them from seeking help. Through physical isolation and psychological trauma, traffickers and brothel owners imprison women in a world of economic and sexual exploitation that imposes a constant threat of arrest and deportation, as well as violent reprisals by the traffickers themselves to whom the women must pay off ever-growing debts. That is the way this works.

Many brothel owners actually prefer foreign women, women who are far from help and from home, who do not speak the language, precisely because of the ease of controlling them. Most of these women never imagined they would enter such a hellish world, having traveled abroad to find better jobs or to see the world.

Many in their naïveté believe nothing bad can happen to them in the rich and comfortable countries such as Switzerland or Germany or the United States. Others are less naive, but they are desperate for money and opportunity. But they are no less hurt by the trafficker's brutal grip.

Trafficking rings are often run by criminals operating through nominally reputable agencies. In some cases overseas, police and immigration officials of other nations participate and benefit from the trafficking. Lack of awareness or complacency among government officials such as border control and consular offices contributes to the problem. Furthermore, traffickers are rarely punished, as official policies often inhibit victims from testifying against their

traffickers, making trafficking a highly profitable, low-risk business venture for some.

Trafficking abuses are occurring not just in far-off lands but here at home in America as well. The INS has discovered 250 brothels in 26 different cities which involve trafficking victims. This is from a CIA report. This is the whole problem of no punishment-being able to do this with virtual impunity.

. . . The bitter irony is that quite often victims are punished more harshly than the traffickers because of their illegal immigration status, their serving as prostitutes, or their lack of documents, which the traffickers have confiscated in order to control the victims.

. . . A review of the trafficking cases showed that the penalties were light and they did not reflect the multitude of the human rights abuses perpetrated against these women. The statutory minimum for sale into involuntary servitude is only 10 years, whereas the maximum for dealing in small quantities of certain drugs is life.

Let me repeat that. The statutory minimum for sale into involuntary servitude is only 10 years, whereas the maximum for dealing in small quantities of certain drugs is life.

Few State and Federal laws are aimed directly at people who deliver or control women for the purpose of involuntary servitude or slavery in sweatshops or brothels. Consequently, prosecutors are forced to assemble cases using a hodgepodge of laws, such as document fraud and interstate commerce, and accept penalties that they believe are too light for the offense. Up until this legislation, there was no way for the prosecutors to go after these traffickers.

The Victims of Violence and Trafficking Protection Act of 2000 establishes, for the first time, a bright line between the victim and the perpetrator. It punishes the perpetrator and provides a comprehensive approach to solving the root problems that create millions of trafficking victims each year.

This legislation aims to prevent trafficking in persons, provide protection and assistance to those who have been trafficked, and strengthen prosecution and punishment for those who are responsible for the trafficking. It is designed to help Federal law enforcement officials expand antitrafficking efforts here and abroad, to expand domestic antitrafficking and victim assistance efforts, and to assist nongovernment organizations, governments and others worldwide, who are providing critical assistance to victims of trafficking. It addresses the underlying problems which fuel the trafficking industry by promoting public antitrafficking awareness campaigns and initiatives in other countries to

14

enhance economic opportunity, such as microcredit lending programs and skills training, for those who are most susceptible to trafficking, and have an outreach so women and girls as young as 10 and 11 know what they might be getting into.

. . . This legislation toughens current Federal trafficking penalties, criminalizing all forms of trafficking in persons and establishing punishment commensurate with the heinous nature of this crime. The bill establishes *specific laws against trafficking.* Violators can be sentenced to prison for 20 years to life, depending on the severity of the crime. *Yes, if you are trafficking a young girl and forcing her into prostitution, you can face a life sentence.*

146 Cong. Rec. S10164-02, 2000 WL 1509753 (emphasis supplied); *see also* 146 Cong. Rec. S7781-01, 2000 WL 1079347; 146 Cong. Rec. S2729-01, 2000 WL 381085 146 Cong. Rec. S2617-01, 2000 WL 373396. In passing 18 U.S.C. § 1591, Congress specifically sought to target those involved in operating the machinery of the trafficking industry.

Subsequent legislative history confirms this congressional intent. In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108-193, 117 Stat. 2875 (December 19, 2003), which made minor, non-material adjustments to section 1591. *See Roe v. Bridgestone Corp.*, 492 F.Supp.2d 988, 1003 (S.D.Ind. 2007). Earlier that same year, Congress passed the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. 108-21, 117 Stat. 650 (April 30, 2003), which also made one minor, non-material change to section 1591. Again, there is no indication in the reauthorizing legislation that section 1591 was intended to be applied beyond the scope of those engaged in the actual business of trafficking.[2]

---

[2] *See* H.R. CONF. REP. 108-66, 2003 WL 1862082, 2003 U.S.C.C.A.N. 683; H.R. REP. 108-264(I), 2003 WL 22067739; H.R. REP. 108-264(II), 2003 WL 22272907; S. REP. 108-2, 2003 WL 330688.

Finally, in 2008, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 (Dec. 23, 2008), which included several amendments to section 1591.  First, the Wilberforce Act added "maintains" to the list of possible conduct constituting the offense.  18 U.S.C. § 1591(a).  This is significant in that it reinforces Congress's intent to capture the conduct of those traffickers such as a brothel landlord who, after minors have been "obtained" for the purpose of forcing them into prostitution or commercial sex acts, "maintain," or keep them for such future or continuing use.  Second, the Wilberforce Act enlarged the knowledge element to include instances where the defendant acts with "reckless disregard" of the fact that a child, force, fraud, or coercion will be used for commercial sex purposes.  18 U.S.C. § 1591(a).  A third amendment absolved the government from having to prove that a trafficker actually knew the age of a child victim where there was a reasonable chance to observe the victim.  18 U.S.C. § 1591 (a), (c).  Additionally, the Act provided definitions for the terms "serious harm" and "abuse of law."  18 U.S.C. § 1591(e)(1), (4).

Congress's explanatory statement in passing these amendments to section 1591 is revealing because it further distinguishes the act's intention to criminalize the conduct of "traffickers" and "sex trafficking – who use children for the purpose of prostitution – as opposed to their "clients" who engage, not in "trafficking," but in illegal "Commercial sex activity":

> Section 222 also clarifies the definition of coercion in the core offenses created by the Trafficking Victims Protection Act, which responded to the Supreme Court's narrowing of the federal Involuntary Servitude statutes in *United States v. Kozminski,* 487 U.S. 931 (1988). Section 1589 covers offenses involving forms of forced labor, while Section 1591 is in the context of commercial sexual activity and can also be violated <u>when a person uses a child</u>

for prostitution, as children are unable to give consent to commercial sexual activity. Those offenses returned the legal standard for a servitude conviction to the modern approach reflected in such cases as *United States v. Mussry*, 726 F.2d 1448 (9th Cir. 1984) and the lower court decisions in Kozminski (allowing conviction in servitude cases involving psychological coercion as well as overt violence).

. . .

It is contemplated that these refinements will streamline the jury's consideration in cases involving coercion and will more fully capture the imbalance of power between <u>trafficker</u> and victim. A scheme, plan, or pattern intended to inculcate a belief of serious harm may refer to nonviolent and psychological coercion, including but not limited to isolation, denial of sleep and punishments, or preying on mental illness, infirmity, drug use or addictions (whether pre-existing or developed by the trafficker). "<u>Commercial sexual activity</u>" in this context is not limited to a particular sex act, but would include all aspects of prostitution, including time under the defendant's control in which the victim is not engaged with <u>clients</u>.

154 Cong. Rec. H10888-01, 2008 WL 5169865 (emphasis supplied).[3]

In sum, there appears to be nothing in the legislative history contravening the view that this particular legislation was aimed directly at those engaged in and profiting from the business of sex trafficking, rather than individuals who may ultimately be clients or customers of such enterprises or ventures, as the defendant is alleged to have attempted to do in this case. The legislative record contains no express suggestion that Congress intended section 1591 to extend to those not involved in the specific activity or business of engaging in sex trafficking. Congress has passed other laws to address such situations where interstate commerce is involved.

---

[3] *See also* 154 Cong. Rec. S10945-01, 2008 WL 5191162; 154 Cong. Rec. H10935-01, 2008 WL 5169876; 154 Cong. Rec. S10880-04, 2008 WL 5169957; 154 Cong. Rec. S10886-01, 2008 WL 5169970; 154 Cong. Rec. D1314-02, 2008 WL 5170115; 154 Cong. Rec. D1315-01, 2008 WL 5170116; 154 Cong. Rec. H10866-02, 2008 WL 5156166.

If Congress had truly intended section 1591 to apply to the "johns" or clients of sex trafficking ventures, the text of the statute would indicate that intent in plain, direct, express, unmistakable, and unambiguous terms.  Moreover, the legislation's sponsors, either in its original form or during the various reauthorization or amendment processes over the years, would have mentioned at least once that this law was *also* intended to apply to the *clients* of sex trafficking rings by virtue of the employment of the term "obtains."

### C.  Case law does not support the application of section 1591 to these alleged acts.

There is no Eighth Circuit or United States Supreme Court decision addressing the proper construction of "obtains" in section 1591.  In terms of controlling precedent, this Court is presented with a case of first impression.  Federal appellate decisions involving the proper application of section 1591 have almost universally addressed defendants involved in various aspects of enterprises that force minors into prostitution, or else coerce or otherwise arrange for them to become involved commercial sex activity – as opposed to those to whom such enterprises are directed, *i.e.* those who pay to participate in a commercial sex act.[4]  It does not appear that any federal appellate court, in the face of a defendant's direct

---

[4] *See, e.g., Daniels*, --- F.3d ---, 2011 WL 2637274 at *8 (upholding application of statute to defendant who ran a prostitution business involving teenage girls); *United States v. O'Connor*, --- F.3d ---, 2011 WL 2417143 *15 (2d Cir. June 16, 2011) (upholding application of statute to defendant who provided minor for production of child pornography); *United States v. Myers*, 2011 WL 2391306 *2-3 (11th Cir. June 15, 2011) (unpublished) (upholding application of statute to defendants who enticed minor into participating in Internet prostitution business); *United States v. Williams*, 2011 WL 1958148 *3-4 (3d Cir. May 23, 2011) (unpublished) (upholding application of statute to defendant "pimp" who transported, coerced, and enticed women into interstate travel for the purpose of prostitution); *United States v. Brooks*, 610 F.3d 1186, 1196-97 (9th Cir. 2010) (holding that evidence was sufficient to support conviction under statute where defendants transported and harbored minors for the purpose of prostitution); *Elbert*, 561 F.3d at 774 (affirming conviction of defendant under statute for

challenge to the sufficiency of the evidence, has upheld the application of section 1591 to those individuals who are solely alleged to be "johns" or customers of sex traffickers.

The closest such appellate decisions appear to be *United States v. Strevell*, 185 Fed. Appx. 841, 2006 WL 1697529 (11th Cir. 2006) (per curiam) (unpublished) and *United States v. Roberts*, 174 Fed. Appx. 475 (11th Cir. 2006) (per curiam) (unpublished).  In *Strevell*, the Eleventh Circuit affirmed the conviction of a defendant under section 1591 for attempting to travel to another country to engage in prostitution with a minor.  185 Fed. Appx. at 842. However, the defendant in that case did not advance any argument that the statute was inapplicable to his conduct, but raised a jurisdictional challenge and alleged that his indictment had been constructively amended.  *See id.* at 843.  In *Roberts*, the defendant's appeal focused upon the interstate commerce element of section 1591, as well as a claim that he had been entrapped.  174 Fed. Appx. at 477.

In *United States v. Mikoloyck*, 2009 WL 4798900 *7 (W.D.Mo. Dec. 7, 2009), the district court, in denying a motion to dismiss for outrageous government conduct, stated that "contrary to defendant's argument, 18 U.S.C. § 1591 clearly applies to those who attempt to purchase underage sex, not merely the pimps of actual exploited children."  The district court's conclusion, consisting of that single declarative sentence, did not provide any analysis or other insight, other than simply to cite to the Eleventh Circuit's unpublished

---

operating prostitution enterprise involving minors); *United States v. Chang Da Liu*, 538 F.3d 1078, 1085 (9th Cir. 2008) (upholding application of statute to defendant who designed scheme to induce Chinese women to move to United States territory in order to be forced into prostitution); *United States v. Curtis*, 481 F.3d 836, 837 (D.C. Cir. 2007) (affirming conviction of defendant "pimp" under statute for involving minors in prostitution ring); *United States v. Wild*, 143 Fed. Appx. 938, 2005 WL 1840172 *3-4 (10th Cir. 2005) (upholding application of statute to defendant who recruited, enticed, and transported minors across state lines for the purpose of profiting from their prostitution).

decisions in *Strevell*, 185 Fed. Appx. at 841 and *Roberts*, 174 Fed. Appx. at 475, discussed above.   The decision's absence of any logic or analysis offered in support of its bald pronouncement, along with its citation to immaterial cases, render it less than compelling.

The absence of any federal appellate decision affirming an interpretation of "obtains" in section 1591 as being applicable to the customers of sex traffickers, more than a decade after the statute was originally enacted, is a undeniable indication that it was intended to target the range of activities of actual traffickers and not their customers.

**D.     The rule of lenity is controlling in this case.**

There are two competing possibilities for the interpretation of "obtains," at issue. First, that one could be engaged in child sex trafficking and "obtain" a minor from others in order to force them into acts of prostitution or other commercial sex acts with third parties, such as the defendant.   Or, as the government urges, it is the customers or "johns" themselves, that actually "obtain" minors within the meaning of section 1591 when they engage in commercial sex acts with them.   Both interpretations cannot be correct.  *See Clark*, 543 U.S. at 382, 386; *Santos*, 553 U.S. at 522-23.

"When interpreting a criminal statute," courts "do not play the part of a mindreader." *Id.* at 515.   Rather, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  *Id.* at 514.   This is so because "[w]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity."   *Bell v. United States*, 349 U.S. 81, 83 (1955) (Frankfurter, J.).   The rule of lenity provides the definitive mechanism for courts to resolve the interpretation of an ambiguous criminal statute:

> This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*Santos*, 553 U.S. at 514. Federal courts are directed to "interpret ambiguous criminal statutes in favor of defendants, not prosecutors." *Id.* at 519. "The tie," in other words, "must go to the defendant." *Id.*

In *Brown*, 598 F.3d at 1018, the Eighth Circuit applied the rule of lenity where it determined that there were two plausible interpretations of a statute implicating "conduct relating to narcotic drugs" under 18 U.S.C. § 804(44). As the court explained:

> "After seizing everything from which aid can be derived," we believe the better reading of § 802(44) is that offenses involving simulated controlled substances are not offenses that prohibit or restrict "conduct relating to narcotic drugs." But if that conclusion is not clear, then the most that we might say for the government's position is that the statute remains ambiguous.
>
> That circumstance would call for invocation of the rule of lenity and a narrower construction of the statute, leading us to the same holding.

*Id.* at 1018 (citing *Santos*, 553 U.S. at 507) (additional citations omitted); *see also United States v. Larson*, 796 F.2d 244, 246 (8th Cir. 1986) (reversing conviction and holding that because "criminal laws are strictly construed and any ambiguity is to be resolved in favor of lenity," the defendant's proposed construction of ambiguous criminal statute was controlling).

Judge Posner has written in an analogous circumstance, "[m]aybe our interpretation of section 2422(b) is no more plausible than the government's. But when there are two equally plausible interpretations of a criminal statute, the defendant is entitled to the benefit

of the more lenient one. 'The tie must go to the defendant.'" *United States v. Taylor*, 640 F.3d 255, 259-260 (7th Cir. 2011) (quoting *Santos*, 553 U.S. at 514).

Taking a fair view in consideration of its context, structure, and the canons of construction, the text of section 1591 is, at a minimum, ambiguous. The structure and intended purpose lean decidedly in the defendant's favor and the legislative history provides no support for the interpretation advanced by the government. "[T]his is a textbook case for application of the rule of lenity." *Hayes*, 129 S.Ct. at 1093 (Roberts, C.J., dissenting). The defendant's proposed construction of what Congress intended when it criminalized the specific activity of recruiting, enticing, harboring, transporting, providing, *obtaining*, or maintaining a minor knowing that she will be caused to engage in a commercial sex act is therefore controlling. Under this construction of section 1591, the prohibition refers to the specific activities of child sex trafficking – obtaining minors in order to force them into acts of prostitution or other commercial sex acts with third parties, rather than the customers or clients of sex traffickers who might ultimately engage commercial sex acts with minors.

## CONCLUSION

A motion for judgment of acquittal should be granted "if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *Cacioppo*, 460 F.3d at 1021; *see also Boesen*, 491 F.3d at 855. The government's evidence establishes only that the defendant responded affirmatively to an advertisement and traveled to a predetermined location as part of an attempt to engage in a commercial sex act with a minor. He did not attempt to engage in child sex trafficking, because he did not attempt to recruit, entice, or "obtain" a minor under a proper

construction section 1591. Therefore, the record contains no facts upon which a court or jury could reasonably determine that the defendant engaged in commercial sex trafficking as defined, properly interpreted, and prohibited under 18 U.S.C. § 1591.

WHEREFORE, the defendant's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) should be granted.

Dated this _____ day of October, 2011.

**BUTLER LAW OFFICE**

**BY** _/s/ Michael J. Butler_
Michael J. Butler
100 S. Spring Ave, Suite 210
Sioux Falls, SD 57104
(605) 331-4417
mike.butlerlaw@midconetwork.com

*Attorney for the Defendant*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of **Defendant's Brief in Support of Motion for Judgment of Acquittal** was served via electronic notice upon the following:

Jeff.Clapper@usdoj.gov

on this _____ day of October, 2011.

_/s/ Michael J. Butler_
Michael J. Butler